UNITED STATES of America, Plaintiff–Appellee,

v.

James R. JACKSON, Defendant–Appellant.

No. 93–6160.

United States Court of Appeals, Sixth Circuit.

Argued May 10, 1994.

Decided May 31, 1994.

Lawrence J. Laurenzi, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Memphis, TN, for plaintiff–appellee.

April R. Ferguson, Asst. F.P. Defender (argued and briefed), Office of the Federal Public Defender, Memphis, TN, for defendant–appellant.

Before: MARTIN and JONES, Circuit Judges; and CONTIE, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

James R. Jackson pled guilty to charges of mail, wire, and credit card fraud, obstruction of correspondence, and fraudulent use of social security numbers. Jackson now challenges the sentence imposed by the district court, contending that the court erred in determining the amount of loss, improperly increased his offense level for obstruction of justice and for his role in the offense, and failed to give him credit for acceptance of responsibility.

## I.

For more than five years, James R. Jackson ran a series of elaborate schemes through which he bamboozled insurance, finance, and credit card companies out of nearly one million dollars. Operating largely from Memphis, Tennessee, Jackson concentrated his efforts in two areas: staging traffic accidents with insured cars and obtaining credit under an alias.

In early 1986, Jackson came up with the idea of filing false accident reports with automobile insurance companies in order to collect cash settlements. In a typical claim, Jackson or an accomplice reported that his car had been severely damaged in a collision with a rental car. The driver of the insured rental car (also a Jackson associate) then professed full liability for the mishap. The claims often listed false names and addresses, misrepresented the parties' driving records, and asserted that no police report was available because the collision occurred on private property. Over a four-year period, Jackson and his cohorts staged more than fifty such accidents and collected approximately $642,057.54 in insurance proceeds.

As the staged accident scheme wound down, Jackson turned his attention to defrauding credit card and finance companies. In 1989 and again in 1991, Jackson used a false Social Security number to purchase a car on credit: GMAC financed the purchase of a 1989 Cadillac Allante valued at $55,000, while Chase Automobile Finance funded the purchase of a 1990 Lexus valued at $40,000. Next, in January 1992, Jackson and an accomplice embezzled a letter addressed to Jack Belz, then used a credit card bearing Belz's name to make cash withdrawals and purchases totalling $116,000. Later that year, Jackson relocated to Dallas, Texas, and, after obtaining credit cards under assumed names (including those of top executives with major U.S. corporations), used the cards to purchase goods and services valued at $115,-600. In total, Jackson's three fraudulent credit schemes resulted in a loss of over $325,000.

On March 10, 1992, a federal grand jury in Memphis returned three separate indictments against Jackson. The first, covering only the insurance scam, charged Jackson and five of his associates with fifty-five counts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343. Jackson's use of the Belz credit card gave rise to the second indictment, which charged Jackson and an accomplice with fraud in connection with an access device, obstruction of correspondence, and fraudulent use of a Social Security number, in violation of 18 U.S.C. §§ 1029(a)(2), 1702 and 42 U.S.C. § 408. The third indictment, arising out of Jackson's purchase of the Cadillac and the Lexus, charged Jackson with fraudulent use of a Social Security number and fraudulent possession of false identification documents, in violation of 42 U.S.C. § 408 and 18 U.S.C. § 1028(a)(3).

On June 16, a federal grand jury in Dallas returned a seven-count indictment against Jackson, charging him with mail fraud, fraudulent use of a Social Security number, credit card fraud, and fraud in connection with access devices, in violation of 42 U.S.C. § 408, 15 U.S.C. § 1644(d), and 18 U.S.C. § 1029(a)(2). Following Jackson's arrest in Dallas, the Northern District of Texas case was transferred to Memphis pursuant to Federal Rule of Criminal Procedure 20.

On January 22, 1993, Jackson entered a plea of guilty to charges of mail, wire, and credit card fraud, obstruction of correspondence, and fraudulent use of a Social Security number. The twelve counts to which he pled were drawn from each of the four indictments. On July 2, the district court sentenced Jackson to an eighty-month term of incarceration, to be followed by three years of supervised release. This timely appeal followed.

## II.

On appeal, Jackson contests only the district court's calculation of his adjusted offense level under the Sentencing Guidelines. To this end, Jackson presses four arguments: (1) the loss attributable to his fraudulent activities did not exceed $800,000; (2) Section 3C1.1's two-level enhancement did not apply because his actions were not designed to obstruct the administration of justice; (3) the government failed to demonstrate that he

was a leader of criminal activity involving more than five participants; and (4) he was entitled to a two-level reduction for acceptance of responsibility.

### A.

■ Contending that the government failed to establish that the amount of loss flowing from his various schemes exceeded $800,000, Jackson challenges the eleven-level enhancement of his base offense level under Section 2F1.1(b)(1). We review the district court's factual findings for clear error and give "due deference to the district court's application of the guidelines to the facts." *United States v. Peters,* 15 F.3d 540, 546 (6th Cir.1994) (citing 18 U.S.C. § 3742(e)). In challenging the court's loss calculation, Jackson must carry the heavy burden of persuading this Court that the evaluation of the loss was not only inaccurate, but was outside the realm of permissible computations. *See* U.S.S.G. § 2F1.1, comment. (n. 8) (a sentencing court "need only make a reasonable estimate of the range of loss, given the available information").

Section 2F1.1(b)(1) directs the sentencing court to increase a defendant's base offense level of six by eleven levels if the loss was "[m]ore than $800,000." In sentencing Jackson, the district court credited testimony that set the total loss at over $900,000: $642,000 for the insurance scam, $95,000 with regard to the two cars, $55,600 for the Dallas credit card scheme, and $116,000 with respect to the Belz credit card scam. Joint Appendix at 138–39. Challenging this calculation, Jackson asserts that he cannot be held accountable for the total loss attributable to the insurance and Belz schemes because he had no knowledge of, nor could he have foreseen, the full scope of the criminal activity undertaken by his accomplices. Jackson characterizes his associates as largely independent operators who simply turned to Jackson for instruction on how to run a fraudulent racket, and claims that the district court erred in finding that the full scope of criminal activity was jointly undertaken. We disagree.

The district court properly assessed the total amount of loss flowing from both the insurance scam and the Belz scheme against Jackson. Under Section 1B1.3(a)(2) of the Sentencing Guidelines, Jackson is to be held responsible for all acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." With respect to jointly undertaken criminal activity, Application Note 2 explains, "[t]he conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision." U.S.S.G. § 1B1.3, comment. (n.2); *see also United States v. Chichy,* 1 F.3d 1501, 1510 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 620, 126 L.Ed.2d 584 (1993). Here, the district court carefully considered evidence regarding Jackson's role in each scheme, including testimony from codefendant Phillip Burnett verifying that Jackson was intimately involved in each transaction, before concluding that the criminal activity was jointly undertaken and reasonably foreseeable to Jackson. Given the facts of record, the district court's finding that the aggregate losses were in excess of $800,000 cannot be considered clearly erroneous.

### B.

■ The district court enhanced Jackson's sentence by two levels under Section 3C1.1 of the Sentencing Guidelines for obstruction of justice. The provision provides:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. The presentence investigation report recommended application of the enhancement based on two incidents: (1) while under investigation by the FBI for insurance fraud, Jackson falsely reported a domestic disturbance at Case Agent Mark Gant's unlisted address, which resulted in the dispatch of a deputy sheriff, firemen, and rescue workers to the Gant home; and (2) following his arrest, Jackson sent a box full of bugs from the Shelby County Jail to the home of United States District Court Judge

Julia Smith Gibbons to protest the conditions at the jail. While concluding that Jackson's conduct with respect to Judge Gibbons was merely "offensive" and "inappropriate," the district court found that Jackson's dispatch of emergency personnel to Agent Gant's home was designed "in part to intimidate Mr. Gant and to seek retribution on him for his part in the investigation." J.A. at 141–42. The court thus determined that the obstruction of justice enhancement was warranted. As the district court is in the best position to determine whether a defendant's actions constitute an obstruction of justice under Section 3C1.1, this Court reviews such decisions under an abuse of discretion standard. *United States v. Medina*, 992 F.2d 573, 591 (6th Cir.1993), *cert. denied*, ⸺ U.S. ⸺, 114 S.Ct. 1049, 127 L.Ed.2d 371 (1994).

Despite Jackson's contentions to the contrary, there is sufficient evidence in the record to support the district court's conclusion. At the sentencing hearing, Agent Gant relayed the substance of a conversation he had with codefendant Burnett following Burnett's arrest. During the discussion, Burnett explained that Jackson was most proficient at unearthing personal information about individuals. According to Burnett, Jackson used his expertise to learn Gant's address, then sent law enforcement officers to Gant's home. J.A. at 110–11. Moreover, Burnett himself testified at the sentencing hearing that he overheard Jackson talking with others about how Jackson sent the fire department to Agent Gant's home. In light of this evidence, the district court acted well within its discretion in imposing the obstruction of justice enhancement.

### C.

Jackson also argues that the district court improperly enhanced his sentence pursuant to Section 3B1.1(a) of the Sentencing Guidelines based upon its determination that he was an organizer or leader of five or more participants. Under Section 3B1.1(a), a district court is directed to increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

U.S.S.G. § 3B1.1(a). In determining whether Section 3B1.1 applies, the court may consider factors such as the defendant's "exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id.* at comment. (n.4). The district court's determination is a factual one and should not be upset unless clearly erroneous. *United States v. Gibson*, 985 F.2d 860, 865 (6th Cir.), *cert. denied*, ⸺ U.S. ⸺, 113 S.Ct. 2981, 125 L.Ed.2d 678 (1993).

There is ample evidence in the record to support the district court's finding that Jackson was the leader or organizer of the insurance fraud scam and that the activity involved five or more participants or was otherwise extensive. Jackson's codefendant, Phillip Burnett, testified at the sentencing hearing that Jackson organized the scheme and supervised the five codefendants directly. J.A. at 127. Burnett also indicated that he did not share equally in the proceeds from Jackson's scams and suggested that Jackson regularly took a larger portion. J.A. at 36, 49–50. Similarly, each of the other four codefendants identified Jackson as the driving force behind the scheme when they entered their guilty pleas. J.A. at 148. Finally, substantial evidence before the district court demonstrated that the insurance scheme involved over fifty separate fraudulent claims, spanned a four-year period, and resulted in losses exceeding $642,000. Given this evidence, the district court did not err in determining that Jackson was a leader and organizer within the meaning of Section 3B1.1(a).

### D.

Jackson asserts that it was a clear abuse of discretion for the district court to deny him a two-level reduction for acceptance of responsibility. Section 3E1.1 of the Sentencing Guidelines provides, "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." In determining

whether a defendant qualifies for the reduction, the sentencing court is advised to consider the truthful admission of offense conduct, the truthful admission of any relevant conduct, and "voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense." U.S.S.G. § 3E1.1, comment. (n.1). Here, the district court concluded that Jackson did not merit a reduction because he attempted to minimize the extent of his involvement, refused to divulge the locations of the Cadillac and Lexus, and provided no assistance to the authorities during their investigation. J.A. at 59, 64–65. This denial of a two-level adjustment for acceptance of responsibility is "entitled to great deference on review," U.S.S.G. § 3E1.1, comment. (n.5), and should not be disturbed unless clearly erroneous. *United States v. Crousore,* 1 F.3d 382, 386 (6th Cir. 1993).

Before this Court, Jackson raises no arguments regarding the commendable quality of his post-arrest behavior or the immeasurable magnitude of his contrition. Instead, Jackson contends that he deserves the acceptance-of-responsibility reduction for one simple reason: by pleading guilty, he conserved a vast amount of judicial resources. While this argument displays a certain logic, this Court has long recognized that a "guilty plea does not entitle a defendant to a sentence reduction as a matter of right." *United States v. Christoph,* 904 F.2d 1036, 1040 (6th Cir.1990), *cert. denied,* 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). Because Jackson is unable to demonstrate that he assisted the authorities, owned up to his criminal behavior, or otherwise accepted responsibility, he fails to carry his burden of proof. The district court's conclusions, on the other hand, are well supported by the record. We thus conclude that the district court's finding is not clearly erroneous.

### III.

For the foregoing reasons, we affirm the judgment of the district court.