NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0150n.06

No. 22-1689

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Apr 02, 2024

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| GEOFFREY MARK HAYS TALSMA, | ) ) | |
| Defendant-Appellant. | ) ) | OPINION |

Before: COLE, CLAY, and BLOOMEKATZ, Circuit Judges.

**CLAY, Circuit Judge.** Defendant Geoffrey Mark Hays Talsma appeals his 192-month sentence after pleading guilty to one count of mail fraud, in violation of 18 U.S.C. § 1341, and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), (b), and (c)(5). Talsma's guilty plea and sentence relate to his role in the rental of nearly 15,000 textbooks under numerous false identities and the subsequent sale of those textbooks for a profit. Talsma now challenges his sentence on three grounds, arguing that the district court incorrectly (1) enhanced his Guidelines offense level under U.S.S.G. § 2B1.1(b)(1) for a loss greater than $1,500,000 but less than or equal to $3,500,000; (2) declined to reduce his offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility; and (3) enhanced his offense level under U.S.S.G. § 3B1.1(a) for his serving as a leader or organizer of criminal activity involving five or more participants. For the reasons set forth below, we **AFFIRM** Talsma's sentence.

## I. BACKGROUND

### A. Factual Background

From 2016 to 2021, Talsma rented thousands of textbooks from Amazon.com ("Amazon"). Rather than return the textbooks when they were due, he kept them and sold them for a profit. To advance this scheme, Talsma repeatedly created new Amazon accounts using stolen and falsified identities. Occasionally, he also called Amazon to falsely claim that he had not received a rental textbook so that Amazon would cancel his rental or credit his account. And he recruited three individuals—Paul Larson, Lovedeep Dhanoa, and Gregory Gleesing—to participate, ultimately teaching them how to rent textbooks and compensating them from the sales. All told, Talsma, individually and with others, rented 14,960 textbooks in this manner.

Each of the 14,960 rental textbooks attributable to Talsma had a pre-set "buyout" price that Talsma could have paid to lawfully keep the textbook. But Talsma neither returned any of the textbooks, nor paid the textbooks' buyout prices. Although Amazon automatically charged the buyout price when a customer failed to return a rental textbook, Talsma circumvented these automatic charges by renting textbooks with gift cards and prepaid Visa cards, the balances of which he would drain. The buyout prices for the 14,960 rental textbooks attributable to Talsma totaled $3,227,347.82.

### B. Procedural Background

On October 5, 2021, a grand jury returned a thirty-one-count indictment against Talsma, charging him with seventeen counts of mail fraud, in violation of 18 U.S.C. § 1341; nine counts of wire fraud, in violation of 18 U.S.C. § 1343; two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), (b), and (c)(5); one count of interstate transportation of stolen

property, in violation of 18 U.S.C. § 2314; and two counts of making false statements to the FBI, in violation of 18 U.S.C. § 1001(a)(2). Talsma initially pled not guilty to these counts.

Talsma was arrested in connection with the indictment on October 14, 2021, and he was released on bond that same day. After Talsma's release on bond, a witness in Talsma's case and a victim of identity theft by Talsma reported that Talsma had stalked and harassed him by driving repeatedly past his home and waiving and honking at his spouse and children. In addition, Talsma committed a number of violations of the conditions set forth for his bond, such as testing positive multiple times for drug use.

In light of the above, the pretrial services and probation office petitioned the district court to revoke Talsma's bond, and the district court scheduled a bond revocation hearing for January 7, 2022. However, the day before the bond revocation hearing, Talsma successfully moved to adjourn the hearing, stating that he had been exposed to COVID-19 and was awaiting test results. On January 11, 2022, Talsma successfully moved again to adjourn the bond revocation hearing, stating that he had tested positive for COVID-19 and attaching a positive test record signed by physician "S. Fichuk." On January 23, 2022, Talsma successfully moved a third time to reschedule the bond revocation hearing, affixing a letter from Dr. Fichuk that explained that Talsma needed additional time to isolate and quarantine.

Shortly thereafter, FBI agents received reports that the correspondence from Dr. Fichuk was not genuine and that Talsma had doctored his COVID-19 test result. Upon investigation, the medical facility at which Talsma had received a COVID-19 test replied that Talsma had tested negative for COVID-19, and Dr. Fichuk—the doctor who purportedly signed Talsma's positive COVID-19 test and directed Talsma to isolate for an additional period—stated that she had not seen Talsma, had not written the correspondence Talsma had submitted, and that his positive test

result appeared doctored. On January 28, 2022, Talsma was arrested and remanded to the custody of the U.S. Marshals Service.

Subsequently, Talsma pled guilty to one count of mail fraud and one count of aggravated identity theft in exchange for the dismissal of the remaining counts against him. The probation office then issued a pre-sentence report that recommended a Guidelines range of 151 to 188 months' imprisonment for Talsma's mail fraud count, based on a total offense level of 31 and a criminal history category of IV. The aggravated identity theft count was excluded from the Guidelines range calculation because it carries a mandatory 24-month consecutive sentence, as set forth in 18 U.S.C. § 1028A(a)(1). *See* U.S.S.G. § 3D1.1(b)(1) (directing courts to exclude statutory consecutive terms of imprisonment from the calculation of a defendant's offense level).

At his sentencing hearing, Talsma was sentenced to 192 months' imprisonment, comprised of a within-Guidelines sentence of 168 months' imprisonment for mail fraud and the statutorily required sentence of 24 months' imprisonment for aggravated identity theft, as well as three years of supervised release. The district court entered judgment on July 28, 2022, from which Talsma timely appealed on August 4, 2022.

## II. DISCUSSION

On appeal, Talsma argues that his 192-month sentence is procedurally unreasonable because the district court failed to calculate his Guidelines range correctly. He specifically challenges three aspects of his Guidelines calculation. He argues that the district court improperly found that he was responsible for a $3,227,347.82 loss to Amazon and erroneously applied a 16-level enhancement under U.S.S.G. § 2B1.1 on this basis. He also claims that the district court should have reduced his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1. Lastly, he contends that the district court should not have enhanced his offense level for serving

as a leader or organizer of criminal activity under U.S.S.G. § 3B1.1. We address each argument in turn.

### A. Amount of Loss under U.S.S.G. § 2B1.1

We begin with Talsma's arguments regarding the amount of loss attributed to him by the district court under U.S.S.G. § 2B1.1. U.S.S.G. § 2B1.1 directs a sentencing court to increase a defendant's offense level based on the monetary loss stemming from the defendant's conduct. *See* U.S.S.G. § 2B1.1(b)(1). As relevant here, a 16-level enhancement applies when the loss is more than $1,500,000 but less than or equal to $3,500,000. *See id.* § 2B1.1(b)(1)(I)–(J). The district court determined that the loss attributable to Talsma was $3,227,347.82 by adding up the buyout prices for the textbooks linked to Talsma, and it therefore applied the 16-level enhancement.

On appeal, Talsma argues that the amount of loss calculated by the district court lacked adequate facts to support it. When an objection to U.S.S.G. § 2B1.1's loss enhancement is preserved, we review the amount of loss for clear error and the methodology used to calculate the loss *de novo*. *See United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021). However, the government argues that Talsma failed to preserve an objection to the district court's fact-finding, and instead preserved a different objection to the loss calculation before the district court, and therefore urges us to review for plain error. *See United States v. Sears*, 32 F.4th 569, 573 (6th Cir. 2022). But even assuming Talsma preserved his objection, thereby avoiding plain error review, the district court adequately calculated the amount of loss under U.S.S.G. § 2B1.1.

A loss for the purposes of U.S.S.G. § 2B1.1 is the greater of two different amounts: the actual loss, defined by the Guidelines commentary as "the reasonably foreseeable pecuniary harm" from a crime, or the intended loss, defined as "the pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1 cmt. n.3(A)(i)–(ii). Whether the actual or intended loss

applies, the district court need only make a "reasonable estimate" of the loss, *United States v. Howley*, 707 F.3d 575, 582 (6th Cir. 2013) (citation omitted), and it is therefore not enough for a defendant to show that another method or amount is a better approximation, *see United States v. Jackson*, 25 F.3d 327, 330 (6th Cir. 1994). Instead, a defendant must show that the district court's loss calculation was "outside the realm of permissible computations." *Id.*

In this case, the district court adopted the pre-sentence report's loss calculation, which was based on the "buyout" price of each rental textbook—in other words, the additional price a customer renting a textbook must pay to purchase the textbook. Based on data provided by Amazon, the pre-sentence report added up the buyout price for each of the nearly 15,000 rental textbooks attributable to Talsma that were never returned, for a total of $3,227,347.82.

Talsma argues that the district court did not adequately find facts to support adding up the buyout prices. When the parties dispute the amount of loss under U.S.S.G. § 2B1.1, the district court must "explain its calculation methods." *United States v. Poulsen*, 655 F.3d 492, 512 (6th Cir. 2011). Such an explanation "simply needs to 'publish the resolution of contested factual matters that formed the basis of the calculation.'" *Id.* at 513 (citation omitted).

The district court satisfied these requirements. The court heard the parties' arguments regarding the loss calculation. Afterward, the court noted that it was basing its loss calculation on the buyout price of each textbook. Rather than "summarily adopt" the government's position, *see United States v. White*, 492 F.3d 380, 415 (6th Cir. 2007) (citation omitted), the district court provided several reasons grounded in the record for why the summed buyout prices were a reasonable estimate of Amazon's losses: (1) When added to the rental price, the buyout price approximates what a textbook would otherwise sell for, (2) the buyout price is set at the time of rental, so unlike other measures, it is a contemporaneous estimate of the textbook's value, and (3)

the buyout price, which is provided in a customer's rental agreement, gives renters notice of what they are accountable for if they fail to return textbooks. And the total loss figure was not merely hypothetical—the specific buyout prices, number of textbooks ordered, IP addresses from which textbooks were rented, and shipping locations linked to Talsma were all drawn from Amazon's records. In light of the above, the district court "explain[ed] its calculation methods" and adequately resolved any factual dispute on the record. *See Poulsen*, 655 F.3d at 512.

Talsma criticizes the fact that buyout prices are set by Amazon's proprietary algorithm, claiming that this renders the buyout prices in his case unsupported by facts in the record. But the district court meaningfully addressed this too. The court listened to the government's statement that Amazon's algorithm "pull[s] from the market at that time, various sources, retailers, wholesalers, other information in the system." *See* Tr. Sentencing Hr'g, R. 176, Page ID #1053. Most importantly, the district court noted that regardless of how the buyout price is set, it is the actual price of which a customer receives notice in a rental agreement and which the customer is automatically charged upon failing to return a rental textbook. A defendant like Talsma could therefore reasonably foresee that amount of loss when he failed to return a textbook and circumvented the automatic charge of the buyout price. U.S.S.G. § 2B1.1 cmt. n.3(A)(i), (iv) (defining actual loss as the "reasonably foreseeable pecuniary harm" and further defining "reasonably foreseeable pecuniary harm" as the "pecuniary harm that the defendant knew or . . . reasonably should have known, was a potential result").

Talsma's challenge to the *facts* supporting proprietary pricing might also be construed as a challenge to a *method* of loss calculation based on proprietary information. But even framed as a methodological challenge, Talsma's argument fails. The buyout price is a valid measure of Amazon's losses because it reflects the actual price that Talsma was supposed to pay under the

terms of his rental agreement if he wanted to keep each textbook. Moreover, in a rental market where the textbooks Talsma kept could have been re-rented numerous times for profit, the one-time buyout price is a notably direct, and perhaps conservative, measure of loss. While a method of loss calculation based on proprietary information may certainly be a cause for concern in some cases, such as when the proprietary information is prepared in the course of litigation, Talsma's buyout prices—although calculated by a proprietary algorithm—were prepared in Amazon's ordinary course of business. We are satisfied that adding up the buyout prices was a valid method to calculate the loss in Talsma's case.

Lastly, the parties dispute whether the district court adopted $3,227,347.82 as a measure of actual or intended loss. As Talsma concedes, either is a valid measure of loss under U.S.S.G. § 2B1.1, so long as the district court takes the greater of the two. *See id.* § 2B1.1 cmt. n.3(A)(i)–(ii). However, Talsma argues that calculations based on intended loss must be reviewed more closely, citing *United States v. Kirschner*, 995 F.3d 327, 337 (3d Cir. 2021). We need not dwell on this argument because the buyout price validly approximates both the actual and intended loss. The buyout price was the actual amount to which Amazon was entitled for each textbook Talsma kept, as well as the amount of which Talsma intended to deprive Amazon when he drained the prepaid Visa cards and gift cards linked to his Amazon accounts to circumvent automatic charges for the buyout price.

Given the above, the district court did not err by calculating $3,227,347.82 as the amount of loss attributable to Talsma, well within the $1,500,000 to $3,500,000 range for a 16-level enhancement. *See* U.S.S.G. § 2B1.1(b)(1)(I)–(J). The district court adequately found facts to support its calculation, and summing the buyout prices was a valid method to calculate the loss.

**B. Acceptance of Responsibility under U.S.S.G. § 3E1.1**

We turn next to Talsma's arguments regarding acceptance of responsibility. Under U.S.S.G. § 3E1.1, when "the defendant clearly demonstrates acceptance of responsibility," the district court is to reduce the defendant's total offense level by two levels, as well as a third level where the defendant satisfies additional requirements. *See* U.S.S.G. § 3E1.1(a)–(b). The district court concluded that Talsma had not clearly accepted responsibility for his conduct and therefore declined to reduce his offense level on this basis.

Whether a defendant accepted responsibility is ordinarily a factual finding that we review for clear error. *See United States v. Roberts*, 243 F.3d 235, 240 (6th Cir. 2001) (per curiam). However, when the facts relevant to the acceptance of responsibility are uncontested—as is true here—our cases have wavered on whether *de novo* review or clear error review applies. *See United States v. Thomas*, 933 F.3d 605, 611 (6th Cir. 2019). We need not decide today which standard of review is applicable because, in either case, the district court properly concluded that Talsma failed to satisfy U.S.S.G. § 3E1.1's requirements for acceptance of responsibility.

Significantly, Talsma received an obstruction of justice enhancement for stalking and harassing a witness' family and for falsifying COVID-19 documents in an effort to delay his bond revocation hearing, and he does not challenge that enhancement. And an enhancement for the obstruction of justice under U.S.S.G. § 3C1.1 "ordinarily indicates that the defendant has not accepted responsibility," except for in "extraordinary cases." U.S.S.G. § 3E1.1 cmt. n.4. Talsma argues that he eventually accepted responsibility because he pled guilty and generally began cooperating after his obstructive conduct. In support, he points out that in a number of cases in which a defendant's Guidelines offense level was not reduced for acceptance of responsibility, the obstructive conduct followed a guilty plea. However, pleading guilty after obstructing justice—

without virtually anything more—is not enough to render Talsma's case "extraordinary." *See id.* Our case law shows as much, since we have a number of times upheld decisions not to apply a reduction for acceptance of responsibility where a defendant pled guilty after obstructing justice. *See United States v. Mahaffey*, 53 F.3d 128, 135 (6th Cir. 1995) (involving a defendant's false statements made during his grand jury testimony); *United States v. Paull*, 551 F.3d 516, 528–29 (6th Cir. 2009) (involving a defendant's false statements at a suppression hearing); *Roberts*, 243 F.3d at 241 (involving a defendant's escape from custody for a state offense prior to his federal indictment for the same underlying conduct). And in other cases, this Court has found relevant whether the obstructive conduct occurred after the indictment, as it did in Talsma's case. *See, e.g.*, *United States v. Angel*, 355 F.3d 462, 478 (6th Cir. 2004); *United States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003).

Talsma may be correct that an earlier obstruction of justice is easier to reconcile with a later acceptance of responsibility. But in his particular case, a subsequent guilty plea and general allegations of cooperation and remorse are not enough for a reduction under U.S.S.G. § 3E1.1, in light of § 3E1.1's commentary about the relationship between acceptance of responsibility and the obstruction of justice. *See* U.S.S.G. § 3E1.1 cmt. n.4. Nor are we persuaded that the government actually supported a reduction for acceptance of responsibility in this case, as Talsma claims, given that the government explicitly endorsed the probation officer's recommendation against the reduction.

Talsma cites a handful of cases in support of his position, but none control in his case. For example, he cites *United States v. Thomas*, in which this Court observed that extraordinary cases under § 3E1.1 often involve a "common sequence" in which "[a] defendant interferes early on with the investigation" and then "confesses to this obstruction and cooperates going forward." 933 F.3d

at 612. But Talsma did not confess to his obstructive conduct. The FBI learned of Talsma's witness intimidation because the witness came forward to complain that Talsma was stalking and harassing his family. Additionally, it was the FBI that discovered that Talsma's COVID-19 test and doctor's letter had been falsified. And it was only after the FBI discovered that he had forged his COVID-19 documents and that his bond was revoked that Talsma pled guilty.

Talsma also cites *United States v. Gregory*. But *Gregory* differs materially from this case. In *Gregory*, a defendant and his sister were sentenced for smuggling contraband into a prison, and the defendant received an obstruction of justice enhancement for telling his sister not to cooperate. 315 F.3d at 638–40. Nonetheless, this Court concluded that the defendant's case was one of the extraordinary cases in which an adjustment for acceptance of responsibility was still proper because the defendant had admitted to the illegal conduct, began to cooperate long before an indictment, and later "undid" his obstruction of justice by urging his sister to cooperate. *See id.* at 640. Unlike the defendant in *Gregory*, Talsma does not allege similar acts undoing his criminal activity and he did not confess to his obstruction. Moreover, while the defendant in *Gregory* told his sister not to cooperate apparently to protect *her* from criminal exposure, *see id.*, Talsma's obstruction directly cuts against his own acceptance of responsibility because he sought to intimidate a witness and to delay proceedings. In his efforts to delay proceedings, he also used the identity of a physician to forge correspondence regarding COVID-19, resonating with the very basis for his aggravated identity theft charge.

Of course, a defendant need not show an acceptance of responsibility as substantial as that in *Gregory*. However, given the above considerations, Talsma has not shown that his case is an extraordinary one. *See* U.S.S.G. § 3E1.1 cmt. n.4. Thus, the district court did not err by declining

to reduce Talsma's total offense level for acceptance of responsibility given his enhancement for an obstruction of justice.

## C. Leadership or Organization under U.S.S.G. § 3B1.1

Lastly, we consider Talsma's objection to his enhancement for serving as a leader or organizer of criminal activity under U.S.S.G. § 3B1.1. Because Talsma made this objection to the district court's Guidelines calculation below, we review the district court's application of the enhancement for an abuse of discretion. *See United States v. Clayton*, 937 F.3d 630, 642 (6th Cir. 2019). Additionally, we review any factual findings the district court made to determine that Talsma was a leader or organizer for clear error, warranting reversal only when we have a "definite and firm conviction that a mistake has been committed." *United States v. House*, 872 F.3d 748, 751 (6th Cir. 2017) (citation omitted).

U.S.S.G. § 3B1.1 directs a sentencing court to apply a four-level enhancement to the defendant's Guidelines sentence when the defendant served as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *See* U.S.S.G. § 3B1.1(a). The commentary to § 3B1.1 directs a court to consider a non-exhaustive list of factors to distinguish leadership from other roles in criminal activity. *See id.* § 3B1.1 cmt. n.4. It points to "[(1)] the exercise of decision making authority, [(2)] the nature of participation in the commission of the offense, [(3)] the recruitment of accomplices, [(4)] the claimed right to a larger share of the fruits of the crime, [(5)] the degree of participation in planning or organizing the offense, [(6)] the nature and scope of the illegal activity, and [(7)] the degree of control and authority exercised over others." *Id.* Although the criminal activity must involve at least five participants or be otherwise extensive, insofar as the government argues that the defendant

controlled others, it need only show that the defendant controlled at least one participant. *See United States v. Minter*, 80 F.4th 753, 758 (6th Cir. 2023).

Talsma does not dispute that the government has validly pointed to five or more individuals who were involved in his unlawful textbook-selling enterprise. Moreover, applying the Guidelines commentary's non-exhaustive factors to this case reveals that Talsma served as a leader or organizer with respect to three individuals—Paul Larson, Lovedeep Dhanoa, and Gregory Gleesing.

As to Larson and Dhanoa, Talsma first approached each one with an opportunity to get involved in his textbook business. Initially, Talsma would order books to Larson's and Dhanoa's homes, sell them, and pay Larson and Dhanoa a fee for allowing him to use their homes as shipping locations. In other words, Talsma recruited Larson and Dhanoa to serve as "drop points" for textbooks and planned the entirety of the offense, implicating at least the third and fifth factors discussed by the commentary to U.S.S.G. § 3B1.1. *See* U.S.S.G. § 3B1.1 cmt. n.4. Talsma later taught Larson and Dhanoa how to rent Amazon textbooks. But Talsma did not merely advise Larson and Dhanoa or passively reveal the nature of his scheme. He had access to and actively monitored Larson's and Dhanoa's Amazon accounts. Moreover, when Larson ordered textbooks, Talsma would sell them and give Larson a share of the profits. And when Talsma began to distrust one of the other individuals that he had recruited, he pivoted to Larson and instructed him to order more textbooks.

Talsma's course of conduct with Gleesing was similar, but arguably involved even more control. As with Larson and Dhanoa, Talsma showed Gleesing how to rent and re-sell Amazon textbooks. However, at least with respect to Gleesing, the record shows that Talsma told Gleesing

which books to order and paid Gleesing for ordering those specific books, plainly exercising control over Gleesing's conduct.

Talsma argues that while he taught Dhanoa, Larson, and Gleesing how to rent and sell textbooks, he did not control their actions. But Talsma was not a mere teacher of illicit conduct— Dhanoa, Larson, and Gleesing acted at Talsma's "direction," were recruited and overseen by Talsma, and were guided by Talsma through "all aspects" of the buying and selling process. *See United States v. Taylor*, 85 F.4th 386, 391 (6th Cir. 2023). This Court has previously upheld an enhancement for leadership under U.S.S.G. § 3B1.1 based on a similar role in criminal conduct. *See, e.g.*, *id.* at 390–91; *see also United States v. Nicolescu*, 17 F.4th 706, 725 (6th Cir. 2021) (concluding that a leadership enhancement was proper with respect to a defendant who created the scheme, recruited others, and directed their conduct).

Relatedly, Talsma argues that while he may have played an essential role in the textbook scheme, he did not exercise leadership over others, citing *United States v. Salyers*, 592 F. App'x 483, 486 (6th Cir. 2015). In that case, this Court vacated a defendant's sentence where the sole basis for the leadership enhancement was that the defendant had been the one to bring heroin to a distribution point—an essential role in the scheme but not one in which the defendant had exercised control over others. *See id.* at 485–86. But unlike a defendant bringing heroin to a distribution point, Talsma was not merely delivering textbooks to a buyer. He created the scheme, recruited others, dictated what textbooks others bought, monitored their accounts, and compensated them.

From these facts, we can conclude that the district court did not abuse its discretion by applying U.S.S.G. § 3B1.1's enhancement for leading or organizing criminal activity.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** Talsma's 192-month sentence.