*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0100p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ANTHONY V. BOLDEN,

*Defendant-Appellant.*

No. 05-5407

>

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 03-20021—Samuel H. Mays, Jr., District Judge.

Submitted: January 22, 2007

Decided and Filed: March 15, 2007

Before: SILER, MOORE, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:** Robert C. Brooks, Memphis, Tennessee, for Appellant. Tony R. Arvin, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

---

**OPINION**

---

ROGERS, Circuit Judge. On December 23, 2002, Darrell C. Chalmers and Carlos Goodwin robbed a Loomis Fargo armed car courier at the Wolfchase Galleria Mall in Memphis, Tennessee. Defendant-Appellant Anthony Bolden, a security guard at the mall, was the "inside man" in this robbery, providing Chalmers and Goodwin with security camera angles and Loomis Fargo procedures. Chalmers and Goodwin left the mall with $922,803.88 in stolen cash and checks. Police arrested Chalmers several weeks later, and Chalmers implicated Bolden as the mastermind of the robbery. After Bolden pleaded guilty, the district court sentenced Bolden to imprisonment for 205 months. Bolden appeals that sentence, challenging two offense-level enhancements that he received under the Sentencing Guidelines, the district court's failure to lower the offense level because of Bolden's purported acceptance of responsibility, and the reasonableness of the sentence under *United States v. Booker*, 543 U.S. 220 (2005). We affirm Bolden's sentence.

1

# I. FACTS

At approximately 7:00 a.m. on the date of the robbery, Antonio Barton and Roy Mae Clark, employees of Loomis Fargo Courier & Company, made a routine stop at the Wolfchase Galleria Mall to pick up the weekend deposits. As Barton removed a canvas bag containing deposits from individual mall stores from a First Tennessee Bank safe, two men wearing ski masks (Chalmers and Goodwin) quickly approached. One of the robbers held a pistol and yelled at Barton, "Get down. Where's your gun?" The other robber, with a gun drawn, yelled at Barton, "Put your hands behind your head." Barton complied by moving to the floor. Barton later stated that, while on the floor, he thought that one robber pointed a gun at the back of his head as the robbers taped his hands together and took his 9mm semi-automatic pistol. When another security guard called Barton on his radio, one of the robbers asked, "She calling you? Is she calling you?" and then pulled the battery out of the radio. The robbers then took the canvas bag containing the deposits.

The security dispatcher dispatched another security guard, Darnell Ingram, to the deposit room to check on Barton. When Ingram saw Barton on the floor, Ingram ran down a hallway and came upon one of the robbers. The robber pointed a gun at Ingram and then threw the gun at him. Unarmed, Ingram retreated back down the hall. Chalmers told FBI agents that he saw a security guard, pointed his gun at the guard, and said, "It's not your business."

Frankie Cotton, a maintenance employee who worked at the mall, encountered one of the robbers as he exited an elevator at the mall's loading dock. The robber pointed a gun at Cotton and told him to "get back." Cotton ran inside and hid behind a brick wall. Cotton saw a second robber exit the mall and get into what he described as a gray, four-door Chrysler Fifth Avenue. The second robber drove the car back to the dock where the first robber threw a bag into the back seat and got into the car. The robbers then drove away from the mall.

Police later determined that the getaway car was a stolen gray Plymouth Diplomat. Police found the car abandoned and burned in Mississippi. According to First Tennessee Bank, a total of $922,803.88 was stolen, which included $704,161.13 in cash and $218,642.75 in checks.

On December 24, 2002, police received a tip that Chalmers and Goodwin were responsible for the robbery. Cotton then identified Chalmers in a photo lineup as one of the robbers.

On January 3, 2003, Bolden was questioned by the FBI about the robbery. Bolden, the lead security guard for the Wolfchase Galleria, said that he was not working on the day of the robbery because he had Mondays off, but was called in at 9:30 a.m. After first denying that he knew Chalmers or Goodwin, Bolden admitted that he grew up with Goodwin and used to "hang out" with Goodwin's brother. Agents asked Bolden whether he would take a polygraph examination, but Bolden said that he wanted to contact an attorney first. Bridgette Jack, a companion of Goodwin, identified a photograph of Bolden as Goodwin's friend "Tony."

On February 18, 2003, agents arrested Chalmers. Chalmers told agents that Bolden approached him and Goodwin at Goodwin's home with the idea of committing a robbery at the mall, something that Bolden had been planning for two years. According to Chalmers, Bolden suggested that the robbery take place around Christmas and on a Monday to maximize the amount of loot. Chalmers told agents that Bolden provided him and Goodwin with the date and times of the Loomis Fargo armored car pickups, information about security camera locations, ski masks, a revolver, gloves, bags, and tape. Chalmers also told agents that Bolden took him and Goodwin on a "dry run" through the mall where Bolden identified escape routes, locations to park so as not to be seen by security cameras, and the First Tennessee Bank deposit area.

Chalmers also told FBI agents that after the robbery, Goodwin called Bolden from his cell phone and that they then met Bolden at an apartment complex. Chalmers said that Bolden took the

money out of the bag, placed it in the trunk of Bolden's car, and then drove to Goodwin's residence where each man took $5,000 and agreed to split the rest of the money at a later date. The next night, Chalmers, Goodwin, and two friends went back for the getaway car, drove it to Mississippi, and burned it.

On January 22, 2003, a grand jury indicted Chalmers and Goodwin. On April 23, 2003, a grand jury returned a superseding indictment against Bolden, Chalmers, and Goodwin. The indictment charged Bolden with three counts: interference with commerce by threats or violence, aiding and abetting, in violation of 18 U.S.C. § 1951 (Count 1); carrying/use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 2); and conspiracy to interfere with commerce by threats or violence, in violation of 18 U.S.C. § 1951 (Count 3). Bolden pleaded guilty to Count 1 and the Government agreed to drop Counts 2 and 3.

In a presentence report, the probation officer assigned to Bolden's case recommended, pursuant to the 2002 Sentencing Guidelines, a base offense level of 20, a criminal history category of I, and the following enhancements: 6 levels under U.S.S.G. § 2B3.1(b)(2)(B) because a firearm was "otherwise used"; 4 levels under § 2B3.1(b)(7)(E) because the loss was greater than $800,000 but less than $1.5 million; 2 levels under § 2B3.1(b)(1) for taking property of a financial institution; 2 levels under § 2B3.1(b)(4)(B) because a person was physically restrained to facilitate commission of the offense; 2 levels under § 3B1.1(c) because Bolden was an organizer, leader, manager, or supervisor of the robbery; and 2 levels under § 3B1.3 because Bolden abused a position of public or private trust. These enhancements would have resulted in an offense level of 38.

In a position paper filed with the district court, Bolden objected to each of these enhancements. Bolden also objected to the failure of the presentence report to include a recommendation of a 2- or 3-level reduction for acceptance of responsibility under § 3E1.1.

On March 4, 2005, the district court held a sentencing hearing. First, the district court concluded, as a matter of law, that "if the weapon was pointed, it was otherwise used for purposes of 2B3.1(b)(2)." Although Bolden disputed this legal conclusion, he admitted that a gun was pointed at a security guard during the robbery. The district court then held that a 6-level enhancement was appropriate because a firearm was "otherwise used" during the robbery.

Second, the district court applied a 4-level enhancement because the total loss exceeded $800,000, with the face value of the stolen checks included in that amount. Bolden argued that the checks were worth "no more than the value of the paper that they are written on" because the drawer of each check was still liable to the payee for the amount of each check. The district court rejected this reasoning:

> The test isn't did you recover some money, either from the robber, or because . . . somebody knew the micker number . . . . That's not the test. The test under the [application] note is the value of the property taken. It's not who lost money. It's not where the liability ultimately falls. What's the value of the property taken? The value of the property, among the parties who were negotiating the instruments, the drawer, if you will, the payee, the depository bank, . . . it's the face amount of the check. That's the amount the drawer wrote the check for. The amount the merchant accepted the check for. The amount that . . . would have been credited to the bank account of the merchant had the robber not intervened and removed the money. I believe that's a fair reading of what loss means under . . . Application Note 3 to 2B3.1.

Third, the district court rejected a 2-level reduction in Bolden's offense level for acceptance of responsibility under § 3E1.1(a). Although Bolden pleaded guilty, the district court concluded that

a decrease in offense level for acceptance of responsibility was inappropriate because Bolden did not "come forward and at least assist[] in an effort to locate the" stolen cash and checks and because Bolden waited until only days before his trial date to plead guilty.

Finally, the district court made a number of decisions which have not been challenged on appeal. The court concluded that a 2-level increase under § 2B3.1(b)(1) for taking property of a financial institution was appropriate. The court also accepted the presentence report recommendations of a 2-level increase under § 2B3.1(b)(4)(B) because a person was physically restrained to facilitate commission of the offense and a 2-level increase under § 3B1.1(c) because Bolden was an organizer, leader, manager, or supervisor of the robbery. However, the court rejected a 2-level increase in Bolden's offense level under § 3B1.3 for abusing a position of public or private trust.

Applying the Guidelines increases, the district court was left with an offense level of 36 and a criminal history category of I. This corresponded to a Guidelines range of 188 to 235 months. The district court considered whether a within-Guidelines sentence would be "reasonable" and concluded that it would. The court then decided to sentence Bolden in the middle of the Guidelines range after weighing the severity of the crime against Bolden's lack of criminal history and willingness to plead guilty. The district court sentenced Bolden to imprisonment for 205 months, supervised release for a term of 3 years, a total assessment of $100, and total restitution of $850,768.03 to be paid to Loomis Fargo and First Tennessee Bank.

On appeal, Bolden makes the following four arguments: (1) the district court erred by applying a 6-level enhancement under § 2B3.1(b)(2)(B) for otherwise using a firearm; (2) the district court erred by applying a 2-level enhancement under § 2B3.1(b)(7)(E) for the amount of loss; (3) the district court erred by not applying a 2-level decrease for acceptance of responsibility; and (4) Bolden's sentence is unreasonable under *United States v. Booker*, 543 U.S. 220 (2005).

## II. ANALYSIS

Each of these arguments is without merit.

### A.        Offense-Level Enhancement for a Firearm Being "Otherwise Used"

The district court properly enhanced Bolden's offense level by 6 levels because a firearm was "otherwise used" during the robbery and not merely brandished.[1] Sentencing Guideline § 2B3.1(b)(2) provides for the following offense level increases: 7 levels "[i]f a firearm was discharged"; 6 levels "if a firearm was otherwise used"; and 5 levels "if a firearm was brandished or possessed." U.S.S.G. § 2B3.1(b)(2)(A)-(C). The definitions for "brandished" and "otherwise used" are listed in the Commentary to § 1B1.1. *Id.* § 2B3.1 cmt. n.1. "'Brandished' . . . means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person." *Id.* § 1B1.1 cmt n.1(c). "'Otherwise used' . . . means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." *Id.* § 1B1.1 cmt n.1(f).

A firearm was more than merely brandished during the robbery when Bolden's accomplices, Chalmers and Goodwin, pointed firearms at and threatened Barton, Ingram, and Cotton. Bolden

---

[1] It is appropriate in this case to review de novo the determination of whether the firearm was "otherwise used." The issue as presented to us is one of the meaning of the words. *See United States v. Moerman*, 233 F.3d 379, 380 (6th Cir. 2000) (de novo review where no dispute as to facts). This contrasts with *United States v. Phillips*, 42 Fed. Appx. 743, 743 (6th Cir. 2002) (unpublished), a case in which the issue was determined to be "fact-specific."

argues that pointing a firearm at an individual is simply brandishing a firearm because it is one form of displaying a firearm. But such action is more than merely displaying a firearm with an intent to intimidate (i.e., brandishing) because by pointing a firearm at an individual and making a demand of that individual, a defendant communicates the implicit threat that if the individual does not comply with the defendant's demands, the defendant will shoot the individual. In contrast, displaying a firearm with intent to intimidate implies a future act of the defendant—that the defendant has the capability to use the firearm in the future, but is not presently threatening to do so.

This is demonstrated by the facts of this case. When Chalmers and Goodwin encountered Barton, one of them, with a pistol pointed at Barton, yelled, "Get down. Where's your gun?" and the other, with a gun pointed at Barton yelled, "Put your hands behind your head." Both of these statements constitute implicit threats; Chalmers and Goodwin were communicating to Barton that if Barton did not follow their directions, he would be shot. Indeed, Barton testified at Bolden's sentencing that "the events that happened the night of the robbery will be with me for a lifetime." Similarly, when one of the robbers pointed a gun at Cotton and ordered him to "get back," the robber was communicating to Cotton that if Cotton did not follow his order, he would shoot Cotton. In both cases, Chalmers and Goodwin more than merely made the presence of their firearms known to Barton and Cotton in order to intimidate them. *See* U.S.S.G. § 1B1.1 cmt n.1(c). Instead, Chalmers and Goodwin threatened Barton and Cotton with the infliction of immediate and deadly force if Barton and Cotton did not comply with their demands.

This reading is supported by holdings in other circuits. This circuit has not addressed the issue of when displaying a firearm crosses the line from "brandished" to "otherwise used" under the current Guidelines definition of "brandished." Other circuits have held that a firearm is "otherwise used" when a defendant points a firearm at an individual and accompanies that action with a demand that the individual do something. In *United States v. Paine*, 407 F.3d 958, 964 (8th Cir. 2005), the defendant said, "This is a stick up. Hand me your large bills," then drew the firearm, pointed it at the bank teller with his finger on the trigger, and said, "I mean it. This is a stick up. Give me your large bills." Relying on cases from six other circuits, the Eighth Circuit in *Paine* held that the firearm was "otherwise used" because the defendant "employed the gun to convey a threat directed at [the bank teller] which was intended to intimidate her into complying with his demands." *Id.* The Third Circuit ruled similarly in a case in which the defendant pointed a gun at a bank employee's head and ordered the employee to empty money into a garbage bag. *United States v. Orr*, 312 F.3d 141, 145 (3d Cir. 2002).

Our decision in *United States v. Moerman*, 233 F.3d at 380, decided under a pre-2000 Guidelines definition of "brandished," does not require a different result. In *Moerman* we distinguished between explicit and implicit threats, but that distinction is no longer supported by the current Guidelines definition of "brandished."

This court in *Moerman* concluded that "[t]he concept of brandishing includes both pointing the firearm and pointing it in a threatening manner." *Id.* In that case, we held that a defendant merely brandished a firearm when, in two separate incidents, he pointed a rifle at a bank teller and demanded that the teller give him money. *Id.* at 380-81 (defendant told one teller, "Give me your money," and told the other teller, "Give me all your money—all of it—give it to me"). The court distinguished cases from other circuits where "the defendant's actions and/or statements directly threatened an individual with the use of the firearm if the person being threatened did not comply with the defendant's demands." *Id.* at 381. The court noted that there was "no claim" in the case "that the defendant threatened to use the firearm with regard to either of the tellers." *Id.* The court

admitted that it drew "no bright line, realizing that under our *de novo* review each of these cases must be decided on its own facts." *Id.*[2]

*Moerman* is distinguishable because the application note defining "brandished" has since been amended. The old version stated that "brandished" "means that the weapon was pointed or waved about, or displayed in a threatening manner." U.S.S.G. § 1B1.1 cmt. n.1(c) (1998). We reasoned that "otherwise using" had to be more than brandishing, and accordingly had to "go beyond" waving about, or displaying in a threatening manner. *Moerman*, 233 F.3d at 380-81. The application note defining "brandished" was changed in 2000 to conform to the definition of "brandish" found in the Act to Throttle the Criminal Use of Guns, Pub. L. No. 105-386, 112 Stat. 3469, 18 U.S.C. § 924(c)(4). *See* U.S.S.G. Appx. C, Vol. II, Amendment 601 (Nov. 1, 2003). The purpose of the amendment was to "avoid confusion that can be caused by different guideline and statutory definitions of identical terms" and to "increase punishment in some circumstances for persons who 'make the presence of the weapon known to another person, in order to intimidate that person,' regardless of whether the weapon is visible." *Id.* Thus under the current Guidelines, the definition of "brandished" can mean as little as displaying part of a firearm or making the presence of the firearm known "in order to intimidate." U.S.S.G. § 1B1.1 cmt. n.1(c) (2002). Pointing a gun while telling someone what to do obviously goes beyond what now constitutes brandishing, and the reasoning of *Moerman* therefore permits the conclusion that what occurred in this case amounts to "otherwise using" a firearm. As the Third Circuit reasoned in *Orr*, 312 F.3d at 145, "[n]either the guidelines nor the caselaw requires . . . a verbalized threat to harm the victim in order to constitute 'otherwise used.'" Such a dividing line does not comport with the reality that an individual who has a gun pointed at her and who is subject to demands from a gunman does not take solace in the fact that the gunman has not explicitly said that if she does not comply with the gunman's demands, she will be shot. Therefore, the district court correctly concluded that pointing a firearm at an individual coupled with a demand of that individual constitutes otherwise using a firearm, and not merely brandishing one.

## B.    Offense-Level Enhancement for Loss from Checks

The district court properly applied the U.S.S.G. § 2B3.1(b)(7) enhancement for the amount of loss.[3] Guideline § 2B3.1(b)(7) requires a 4-level enhancement to the base offense level where the "loss" is more than $800,000 but less than $1.5 million. "'Loss' means the value of the property taken, damaged, or destroyed." U.S.S.G. § 2B3.1 cmt. n.3. In this case, Debbie Lee, Retail Support Manager for First Tennessee Bank, testified before the district court that of the total amount of cash and checks stolen ($926,570), the bank was only able to identify drawers for $75,799.55 worth of checks, leaving a deficiency of approximately $850,770. Loomis Fargo paid the bank $600,000 under a liability provision of their contract with the bank. The bank charged off a total of $250,768.03 in 2002 and 2003. Thus, Loomis Fargo suffered an actual loss of $600,000 and the bank suffered an actual loss of $250,768.03, for a total actual loss of $850,768.03. With respect to

---

[2]Judge Norris dissented in *Moerman*. He argued that "other circuits have found that pointing firearms in a threatening manner can constitute 'otherwise using' based upon the proximity of the weapon to the victim." *Id.* (Norris, J., dissenting). Quoting from a District of Columbia Circuit case, Judge Norris noted that "'[t]he underlying rationale of the majority [of the circuits] view suggests that the key consideration is whether a gun (or other weapon) was pointed at a specific person in an effort to create fear so as to facilitate compliance with a demand, and ultimately to facilitate the commission of the crime.'" *Id.* (quoting *United States v. Yelverton*, 197 F.3d 531, 534 (D.C. Cir. 1999)). Judge Norris disagreed with the majority's assertion that there was no threat to use the firearm in *Moerman*: "Surely, by pointing the gun at the tellers and demanding money, defendant intended to convey the threat of dire consequences should they fail to comply." *Id.* at 382. Importantly, Judge Norris noted that the amended application note (which did not apply in *Moerman*) supported a "less expansive reading of 'brandishing.'"

[3]Again, with facts not in dispute, we review de novo. *See United States v. Rothwell*, 387 F.3d 579, 582 (6th Cir. 2004).

these out-of-pocket expenses, the stolen checks were no different than cash because neither the bank nor the merchants were able to identify the drawers of the checks and recover the value of the checks from those drawers.[4] Thus, the district court properly determined that the loss exceeded $800,000, although we do not adopt the district court's broader rationale that the amount of loss included the face value of all the checks regardless of whether the bank was out the money.

Arguably, as the district court determined, the $75,799.55 in checks that were stolen, but not charged off, should also be considered as part of the "loss" under § 2B3.1(b)(7), even though neither the merchants, nor the bank, nor the courier suffered any actual loss. *See United States v. Weaver*, Nos. 90-5118/19/20, 1992 WL 138345, at \*8 (4th Cir. June 22, 1992) (unpublished) ("While we do not agree that an instrument's face value will always necessarily provide a reasonable indicator of the loss incurred by the theft of that instrument, if the instrument is authentic, the face value is generally a sufficient measure to establish a presumption in the government's favor for the purpose of valuing the loss under the sentencing guidelines."); *cf. United States v. Parker*, 903 F.2d 91, 105 (2d Cir. 1990) (holding that the value of property taken includes cash that was stolen but not transferred from stolen car to getaway car because "[p]roperty removed from its rightful owner is properly considered taken even if it is immediately thereafter recovered"). Bolden argues that it is "common sense" that the value of the stolen checks was not the face value of the checks because "[t]here were ample measures which the bank and/or the merchants easily could have taken to prevent any actual loss" and because "none of the stolen checks has been negotiated." However, regardless of whether the district court erred in counting that amount, the total loss still would exceed $800,000 and the 4-level enhancement under § 2B3.1(b)(7)(E) would be appropriate. It is therefore not necessary for us to decide whether the face value of these checks should be included in the amount of loss in order to conclude that the district court properly applied a 4-level enhancement.

## C.      Offense-Level Decrease for Acceptance of Responsibility

The district court properly denied Bolden a 2-level decrease in his offense level for acceptance of responsibility. In making this determination we apply the overall deferential scope of review set forth in *Buford v. United States*, 532 U.S. 59, 64-65 (2001). *See United States v. Webb*, 335 F.3d 534, 537 (6th Cir. 2003). This is because, like the U.S.S.G. § 4B1.2 provision in *Buford*, § 3E1.1 determinations involve an overall legal decision that is fact-bound, the district court has comparatively great expertise, and the value of uniform court of appeals precedent is limited. *See Buford*, 532 U.S. at 64-66; *see also* U.S.S.G. § 3E1.1 cmt. n.5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review.").

Indeed, with respect to purely factual components of the acceptance of responsibility determination, we reject such determinations only if they are clearly erroneous. *See United States v. Brown*, 367 F.3d 549, 556 (6th Cir. 2004) (contested facts). Here the only pure-fact dispute remaining is whether Bolden knew where the loot was. Bolden claimed that he had no knowledge of where the stolen cash and checks were, whereas the Government argued (and the district court agreed) that Bolden did know the location of the stolen cash and checks. *Compare* JA 190 (Bolden) ("[Bolden] has stated that he does not know where the proceeds of this crime are, that he never got those."), *with* JA 202 (District Court) ("I don't believe [Bolden] has been candid and come forward with what he knows about the money."). On the record before us, the district court's determination is not clearly erroneous.

---

[4]The Government does not rely on this argument, although the Government does state that "the bank from whom the checks were taken certainly suffered a loss in having to reimburse the mall merchants." However, the district court heard testimony as to the amount of liability loss that Loomis Fargo suffered and the amount of actual loss that the bank suffered, so this court may affirm on these alternative grounds.

This leads to the purely legal question of whether the district court may consider failure to disclose where the loot was as part of its acceptance of responsibility determination. It is arguable that with respect to such a purely legal component issue—as opposed to the overall acceptance of responsibility determination—no deference to the district court is warranted. *Cf. United States v. Reaume*, 338 F.3d 577, 582-83 (6th Cir. 2003) (suggesting that the subissue of whether intent is required under 18 U.S.C. § 1344 is an issue of law, to be determined independently). Deference to potentially conflicting lower court interpretations of purely legal issues risks tension with the fundamental judicial imperative that like cases be judged alike. *See Indmar Prods. Co. v. Comm'r*, 444 F.3d 771, 785 (6th Cir. 2006) (Rogers, J., concurring). We need not resolve this scope-of-review question in this case, however, inasmuch as our independent resolution of the legal subissue in this case is the same as that of the district court.

In particular, contrary to the argument of defendant, a district court may take into account, in denying a downward adjustment for acceptance of responsibility, a defendant's failure to reveal the location of stolen valuables. Under Sentencing Guideline § 3E1.1(a), a defendant receives a 2-level decrease in his offense level if he "clearly demonstrates acceptance of responsibility for his offense." It is true that the commentary for § 3E1.1 does not explicitly say that the district court can deny the 2-level decrease if a defendant pleads guilty but fails to cooperate with the authorities in recovering stolen money from a robbery. The commentary states that "[e]ntry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct . . . will constitute significant evidence of acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n.3. The commentary also notes that "a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction" to receive the offense-level decrease and "may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a [§ 3E1.1(a)] reduction." *Id.* § 3E1.1 cmt. n.1(a). On the other hand, the commentary provides that "appropriate considerations" in determining the offense-level decrease "include . . . voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense." *Id.* § 3E1.1 cmt. n.1(e).

Permitting the court to take such noncooperation into account is supported by this court's previous determination that a district court could consider a defendant's failure to cooperate with authorities in deciding whether to grant the 2-level decrease under § 3E1.1. In *United States v. Jackson*, 25 F.3d 327, 332 (6th Cir. 1994), the district court denied the defendant an offense-level reduction for acceptance of responsibility because the defendant "attempted to minimize the extent of his involvement [in a fraud scheme], refused to divulge the locations of [two cars fraudulently purchased], and provided no assistance to the authorities during their investigation." This court held that the district court's decision was not clearly erroneous because the defendant was "unable to demonstrate that he assisted the authorities, owned up to his criminal behavior, or otherwise accepted responsibility." *Id.* This court noted that the defendant only argued that he was entitled to the offense-level reduction because "by pleading guilty, he conserved a vast amount of judicial resources," and responded by pointing out that this court "has long recognized that a 'guilty plea does not entitle a defendant to a sentence reduction as a matter of right.'" *Id.* (quoting *United States v. Christoph*, 904 F.2d 1036, 1040 (6th Cir. 1990)).

Although *Jackson* is not directly on point because the district court here did not suggest that Bolden has attempted to minimize his role in the robbery or otherwise failed to "own up" to his behavior, *Jackson* supports the conclusion that a district court may weigh heavily a defendant's failure to assist the authorities in recovering unlawfully obtained properly. It was accordingly legally proper for the district court in this case to take into account Bolden's failure to tell police the location of the stolen cash and checks.

*Jackson* also forecloses Bolden's argument that "[t]here are significant potential Fifth Amendment [privilege against self-incrimination] problems with conditioning a reduction in sentence based upon [a] duty of a defendant to speak about the disposition of stolen money in a robbery." Furthermore, it is not even clear whether there are Fifth Amendment implications of requiring Bolden to disclose the location of the stolen money because such disclosure would not increase the penalty to which Bolden was already subject by pleading guilty to the underlying robbery. *See, e.g.*, *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973) ("The [Fifth] Amendment . . . privileges [an individual] not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, *where the answers might incriminate him in future criminal proceedings*." (emphasis added)).

Finally, the district court also considered the last-minute nature of Bolden's plea. This was an appropriate consideration. The Guidelines Commentary states that an "appropriate consideration[]" in determining the offense level decrease is "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." *See* U.S.S.G. § 3E1.1 cmt. n.1(h).

Thus in denying Bolden the 2-level decrease for acceptance of responsibility, the district court found no clearly erroneous facts, and made no legal error. The determination must be upheld in light of the deferential standard of review and the discretion that the Sentencing Guidelines afford a district judge in balancing the factors discussed in the commentary to § 3E1.1.

## D.     Reasonableness of Sentence under *Booker*

Finally, Bolden's sentence is reasonable under *Booker*, both procedurally and substantively.

Bolden's sentence is procedurally reasonable because the record demonstrates that the district court appropriately considered the § 3553(a) factors. First, the court considered "the nature and circumstances of the offense." *See* 18 U.S.C. § 3553(a)(1). The court stated the following:

> Mr. Bolden was the mastermind of this crime. It's a horrible crime. It involved risk of life. It involved weapons. It involved the possibility – anyone easily could have been killed under this circumstance. . . . Certainly the management of the Mall was put at risk of death or injury. Mr. Bolden's co-workers, the people he worked with every day, were at risk of death or serious injury. . . . Mr. Barton, the Guard, was placed on the ground with a gun to him. He easily could have been killed. He was certainly traumatized. The risk of life, it's a miracle someone wasn't killed during the course of this thing.

The district court also commented on the amount of loss and the fact that Bolden "thought of the crime, he initiated it, he recruited the two who committed it[, h]e organized it and he provided [Chalmers and Goodwin] with inside information to commit it."

Second, the district court considered "the history and characteristics of the defendant." *See* 18 U.S.C. § 3553(a)(1). The court noted that Bolden had in his favor "a criminal history of zero" and had "never committed a crime that produced a criminal history point in his life."

Third, the district court considered "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense[,] to afford adequate deterrence to criminal conduct[, and] to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(2)(A)-(C). The court stated the following:

> This was an extremely serious offense. It was an offense that because it was in a highly public area could have been much more serious than it was. And one does have to state the seriousness of that offense, promote respect for the law, and provide

for just punishment. And I have already said that I think a non Guideline sentence would not and could not do that. Nor would it afford adequate deterrence for criminal conduct. If 50 months [Bolden's counsel asked for a 60 month sentence] is adequate for putting human life at stake, terrorizing people, stealing a million dollars, you might as well give away the bank keys. So, I also need to protect the public. I am not convinced that a non Guideline sentence would protect the public under these circumstances.

Finally, the district court considered "the kinds of sentence and the sentencing range established" by the Sentencing Guidelines and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(4) & (6). The court agreed with the Government that the appropriate Guidelines range was 188 to 235 months, which corresponded to an offense level of 36 and a criminal history category of I. The court also noted that a within-Guidelines sentence took into account the facts and circumstances of this case and promoted uniformity.

Bolden objects to the procedural reasonableness of his sentence because the district court imposed what it thought to be a "reasonable" sentence, instead of complying with the requirement of 18 U.S.C. § 3553(a) to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2). True, this court has made clear that "a district court's job is not to impose a 'reasonable' sentence. Rather, a district court's mandate is to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2). Reasonableness is the *appellate* standard of review in judging whether a district court has accomplished its task." *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006). However, this court also has noted that "misstatements of the district court's sentencing task do not necessarily imply a reversible sentencing error." *United States v. Davis*, 458 F.3d 505, 510 (6th Cir. 2006); *see also United States v. Merrell*, No. 05-6577, 2007 WL 64237, at *6 (6th Cir. Jan. 9, 2007) (unpublished). In *Davis*, the district judge similarly purported to impose a "reasonable" sentence, asking at the sentencing hearing whether a within-Guidelines sentence would be reasonable and ultimately sentencing the defendant accordingly because the judge concluded that such a sentence was reasonable. *Id.* at 509. This court nonetheless affirmed the defendant's sentence and held that the sentence was reasonable because the district judge considered the sentencing factors set forth in 18 U.S.C. § 3553(a) and chose a substantively reasonable sentence. *See id.* at 510-11.

Bolden's sentence is also substantively reasonable. This court applies a rebuttable presumption of reasonableness to within-Guidelines sentences. *See, e.g.*, *Davis*, 458 F.3d at 510. The record does not suggest that Bolden has rebutted this presumption. In applying the § 3553(a) factors, the district court weighed "[t]he lack of criminal history against . . . the very cold blooded nature of the crime." The court gave Bolden some consideration for pleading guilty (although, as discussed above, not the 2-point decrease for acceptance of responsibility). The court applied the § 3553(a) factors to Bolden's circumstances and determined that 205 months, a sentence in the middle of the Guidelines range, was appropriate. Bolden does not suggest that this resulting sentence was too high under § 3553(a). Therefore, Bolden's sentence was reasonable.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Bolden's sentence.