**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 21-4281**

_____

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

REGGIE PETTUS,

        Defendant – Appellant.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:19-cr-00118-RJC-DSC-1)

_____

Argued: September 19, 2023                             Decided: January 8, 2024

_____

Before GREGORY and HEYTENS, Circuit Judges, and Deborah L. BOARDMAN, United States District Judge for the District of Maryland, sitting by designation.

_____

Vacated and remanded for resentencing by published opinion. Judge Heytens wrote the opinion, in which Judge Gregory and Judge Boardman joined.

_____

**ARGUED:** Jared Paul Martin, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Anthony Martinez, Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

_____

TOBY HEYTENS, Circuit Judge:

Reggie Pettus pleaded guilty to possessing a firearm after being convicted of a felony. Pettus raises four challenges to his sentence. Concluding at least one of those challenges has merit, we vacate the district court's judgment and remand for resentencing.

I.

This case began with a robbery in Charlotte, North Carolina. Just after 1 a.m. on September 18, 2018, Pettus ran up to the much larger Matthew Salley and snatched a gold chain from Salley's neck. Pettus fled, but Salley soon caught up and began beating Pettus with his fists. In response, Pettus pulled a gun, and Salley retreated.

The story does not end there. Just over an hour later, Pettus and Salley encountered each other again, and Pettus fired several shots in Salley's direction. (For his part, Pettus claims one of Salley's associates had just shot at him from a moving SUV and that he only shot at Salley because he believed Salley was about to attack him again.) Pettus then ran into a nearby parking garage and hid his gun in the wheel well of a parked car.

The report of gunshots in a busy commercial area attracted dozens of police officers, some of whom saw a man—who turned out to be Pettus—run into the parking garage. Soon after, officers entered the garage, found Pettus, and told him they were conducting an active shooter investigation. Pettus claimed to have done nothing wrong, insisting he had been shot in the head and was now looking for his girlfriend. Pettus did not mention his role in the gunshots or where he had hidden his gun.

The officers let Pettus leave the garage but followed on foot. Salley, who was talking to other officers on the street, spotted Pettus and shouted: "That's him; that's the guy who

2

snatched my chain." JA 63. The officers ordered Pettus to lie down and handcuffed him. They found his gun soon after.

Pettus pleaded guilty to possessing a firearm after being convicted of a felony. The presentence report calculated a total offense level of 26, and a Guidelines range of 92 to 115 months of imprisonment. During the sentencing hearing, Pettus made several objections, all of which the district court overruled. The court also declined to consider various written objections Pettus filed to the proposed conditions of supervised release, noting they had been filed after the deadlines set by the Federal Rules of Criminal Procedure and the court's local rules. The district court sentenced Pettus to 108 months of imprisonment and imposed the challenged supervised release conditions without change.

## II.

Although Pettus raises four challenges to his sentence, one is dispositive here. Concluding the district court did not provide "a sufficient explanation of its rationale" for applying an obstruction of justice enhancement to permit "meaningful appellate review," we vacate the court's judgment and remand for a new sentencing hearing. *United States v. Wilkinson*, 590 F.3d 259, 269–71 (4th Cir. 2010) (following the same approach).

## A.

The Federal Sentencing Guidelines prescribe a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction[.]" U.S.S.G. § 3C1.1. Although we must "accord due deference to a district court's application of the sentencing guidelines," our standard of

3

review depends on whether a given dispute is mostly legal or factual. *United States v. Steffen*, 741 F.3d 411, 414 (4th Cir. 2013). If the issue on appeal "turns primarily on a factual determination," we "apply the 'clearly erroneous' standard." *United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir. 1989). "In contrast, if the issue turns primarily on the legal interpretation of a guideline term, the standard moves closer to de novo review." *Steffen*, 741 F.3d at 414 (alterations and quotation marks removed).

The district court's explanation for overruling Pettus's objection to the obstruction of justice enhancement is opaque and prevents us from determining whether the matters in dispute are mainly factual or legal. After quoting the Guidelines' language and referencing three application notes, the court said:

> I think the obstruction here is with the concealment. That there is an active shooting investigation going on. The defendant has engaged in conduct involving, the Court has found robbery, possession of a gun to facilitate that robbery, brandishing a gun to complete it. And then subsequent to that in the same general area fires the firearm, at least three shots, and then conceals the firearm in such a way, tells officers he did nothing wrong. All that appears to the Court to be part of a plan to impede and obstruct the investigation. Apparently, it took over 20 minutes for over 20 officers to ultimately find the gun, determine that there is not an active shooting situation.

JA 79.

The district court's use of "concealment" is most naturally read as a reference to application note 4(D), which the court had mentioned earlier. That provision is part of an 11-item "non-exhaustive list of examples . . . to which" the obstruction enhancement applies. U.S.S.G. § 3C1.1 cmt. n.4. Note 4(D) begins by establishing a general rule that "concealing . . . evidence that is material to an official investigation . . . or attempting to do so" constitutes obstruction of justice for purposes of the Guidelines. § 3C1.1 cmt. n.4(D).

4

But that principle, the note continues, is subject to an exception for "conduct [that] occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance)." *Id.* In that situation, trying to conceal even the most critical evidence "shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it results in a material hinderance to the official investigation or prosecution of the instant offense or the sentencing of the offender." *Id.* (emphasis added). To sum up: whether note 4(D) calls for application of the obstruction enhancement requires knowing if Pettus hid the gun "contemporaneously" with his arrest, and, if so, whether that act resulted in a "material hinderance" to a relevant investigation.

The problem is that, on this record, we cannot tell how (or even if) the district court answered those questions. Take the "contemporaneously" issue. Although the parties dispute what that term means in this context (a purely legal issue) and whether the relevant standard is satisfied here (a mostly factual one), the district court made no ruling on either of those points. Cf. *United States v. Lamere*, 980 F.2d 506, 515 n.6 (8th Cir. 1992) (interpreting contemporaneous conduct as a "reflexive response occurring at the point arrest becomes imminent" rather than "cool and deliberate actions" taken after arrest).

The same is true of the "material hinderance" question. To be sure, the court referenced the time and effort it took to find the gun and "determine that there [was] not an active shooting situation." JA 79. But, here too, the district court neither directly ruled on the question, nor explained its basis—legal or factual—for concluding a brief delay in locating Pettus's gun would have materially hindered any official investigation. Cf. *United States v. Welshans*, 892 F.3d 566, 582 (3d Cir. 2018) (describing government's proposed

5

interpretation of material hinderance as "far too broad" because "[a]ll acts of destroying or concealing evidence require at least some 'extra time' to investigate").

Nor do the difficulties end there. Consider the district court's reference to Pettus's claim to the officers that "he did nothing wrong." JA 79; accord JA 74 ("The Court: 'I did nothing wrong.' That was not true."). Perhaps the district court meant to invoke application note 4(G), which says obstruction includes "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1 cmt. n.4(G). But the government does not defend the district court's ability to rely on that provision here, and it is, at minimum, unclear whether the court could permissibly have done so. See, *e.g.*, *United States v. Ahmed*, 324 F.3d 368, 372–74 (5th Cir. 2003) ("not all false statements to law enforcement officers automatically incur the sentence enhancement" and there is no general duty "to assist the authorities"). Instead, the government insists the district court did not rely on Pettus's false statements at all, even though the court referenced one such statement and quoted application note 4(G) when announcing its ruling. See JA 78–79. So, here too, we are left wondering about the role Pettus's initial denials of responsibility played in the district court's sentencing decision.

True, "[i]n most contexts, a district court's lack of explanation doesn't amount to error, even if it makes our job harder." *Frazier v. Prince George's Cnty.*, No. 23-6359, 2023 WL 7563846, at *4 (4th Cir. Nov. 15, 2023). But there is a difference between hard and impossible. As a court of review, we "may not guess at the district court's rationale, searching the record for . . . clues that might explain" the court's sentencing decision.

6

*United States v. Carter*, 564 F.3d 325, 329–30 (4th Cir. 2009). And the rationale offered here leaves us unable to pinpoint why the district court overruled Pettus's objection to the obstruction of justice enhancement—a gap that, in turn, renders us unable to identify or apply the correct standard of review. Because the district court's "rationale was indeterminable," we "vacate . . . and remand for further fact-finding and resentencing." *United States v. Burnley*, 988 F.3d 184, 190 (4th Cir. 2021); accord, *e.g.*, *United States v. Bolden*, 964 F.3d 283, 289 (4th Cir. 2020) (similar).

We emphasize, however, that this remand does not mean the government gets a second bite at the apple. Rather, the district court should make its determination about the presence or absence of obstruction based on the record as it exists. Accord *United States v. Rowe*, 919 F.3d 752, 763 (3d Cir. 2019) (noting "the Government should not generally receive a second opportunity to present evidence for sentencing absent a persuasive reason").

## B.

We could stop there. But certain issues already addressed by the district court and briefed in this Court seem "likely [to] arise on remand," so we take the opportunity to address them briefly now. *Reynolds v. Middleton*, 779 F.3d 222, 232 n.5 (4th Cir. 2015); accord, *e.g.*, *United States v. Moore*, 709 F.3d 287, 294 (4th Cir. 2013).

### 1.

The district court did not clearly err in enhancing Pettus's offense level by four because he "used or possessed" a firearm "in connection with another felony offense"— that is, the robbery of Salley. U.S.S.G. § 2K2.1(b)(6)(B); see *United States v. Jenkins*,

7

566 F.3d 160, 163 (4th Cir. 2009) (district court's case-specific determination of whether a firearm had the potential of facilitating another offense is "a factual determination . . . subject to a clearly erroneous standard of review").

The district court identified two "independent[]" reasons for applying the Section 2K2.1(b)(6)(B) enhancement. JA 73. The first was that Pettus possessed the firearm in connection with the initial encounter when he approached Salley and ripped off his chain. The second was that Pettus used or possessed the firearm during the ensuing altercation where Salley was "tr[ying] to get his property back" and Pettus brandished the gun to get Salley to stop the beating. JA 73. We need not decide whether the second theory is viable because we conclude the first is supported by the law and facts.

"The purpose of" the Section 2K2.1(b)(6)(B) "enhancement is to ensure that a defendant receives more severe punishment if, in addition to committing a firearms offense . . ., he commits a separate felony offense that is rendered more dangerous by the presence of a firearm." *United States v. Blount*, 337 F.3d 404, 406 (4th Cir. 2003) (addressing version previously codified as Guidelines § 2K2.1(b)(5)). "[T]he firearm must have some purpose or effect with respect to the" underlying crime, and "its presence or involvement cannot be the result of accident or coincidence." *Id.* at 411. At the same time, this Court has emphasized that the relevant "standard is not especially burdensome" and that the enhancement applies in "cases where a firearm is present for protection or to embolden the actor." *Bolden*, 964 F.3d at 287 (quotation marks omitted).

That is exactly what the district court found happened here. Noting Pettus had stolen "the chain off the much larger victim" (Salley was more than a foot taller and 100 pounds

8

heavier than Pettus), the district court found Pettus's possession of a gun emboldened him in committing the robbery. JA 72. That finding is supported by the record, and we see no reason to question it.

2.

The parties disagree about which relevant conduct standard the district court used when applying a robbery cross-reference during the previous sentencing hearing. There are two possibilities: the district court could have applied the "narrower definition of relevant conduct" in Guidelines § 1B1.3(a)(1) or the "broader relevant-conduct definition" in Section 1B1.3(a)(2). U.S. Br. 27–28. Because Pettus must now have a new sentencing hearing, we need not resolve what happened during his previous one. But without embarking on a lengthy discussion of those intricate provisions, we emphasize the government's concession in this Court that the correct standard here is the narrow one set out in Section 1B1.3(a)(1). See U.S. Br. 27; accord U.S.S.G. § 1B1.3(a)(2) (broader standard applies "solely with respect to offenses for which § 3D1.2(d) would require grouping of multiple counts"), and § 3D1.2(d) ("[s]pecifically exclud[ing] . . . all offenses in" Guidelines § 2B3.1, the provision governing robbery offenses).

3.

We also need not decide whether the district court abused its discretion in refusing to consider the merits of Pettus's belated objections to the proposed conditions of supervised release. See *United States v. Morsley*, 64 F.3d 907, 914 (4th Cir. 1995) (describing whether to rule on "dilatory objections" as "a matter left to [the district] court's discretion"). Given our vacatur of Pettus's sentence, the probation officer will need to

9

decide whether any modifications to the presentence report are warranted, at which point Pettus will have a new opportunity to file objections. See, *e.g.*, *United States v. Chandia*, 675 F.3d 329, 334–35 (4th Cir. 2012) (describing proceedings following remand for resentencing). We trust future objections will be filed in a timely manner. That said, we emphasize that—regardless of whether a defendant has filed a timely objection—a sentencing court has an independent duty to assure itself that any non-mandatory conditions of supervised release satisfy the three-part test set forth in 18 U.S.C. § 3883(d)(1), (2), and (3). Cf. *United States v. Boyd*, 5 F.4th 550, 559 (4th Cir. 2021) (noting a district court's obligation to "address . . . head-on" any information "that cast[s] doubt on" a proposed condition's "compliance with § 3583(d)").

*      *      *

The judgment of the district court is vacated, and the case is remanded for resentencing consistent with this opinion.

*SO ORDERED*

10