**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-4532

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

THOMAS EARL FAULLS, SR.,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of Virginia at Charlottesville.  James P. Jones, Senior District Judge.  (3:13-cr-00001-JPJ-1)

Argued:  January 31, 2025                     Decided:  August 5, 2025

Before DIAZ, Chief Judge, HARRIS, and BERNER, Circuit Judges.

Affirmed by published opinion.  Judge Berner wrote the opinion, in which Chief Judge Diaz and Judge Harris joined.

**ARGUED:** Erin Margaret Trodden, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlottesville, Virginia, for Appellant.  S. Cagle Juhan, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.  **ON BRIEF:** Mary E. Maguire, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlottesville, Virginia, for Appellant.  Christopher R. Kavanaugh, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

BERNER, Circuit Judge:

Thomas Faulls challenges the district court's imposition of a sentencing enhancement that penalized his "use" of a dangerous weapon in a kidnapping. Faulls kidnapped his estranged wife Lori by luring her to his house under false pretenses and forcing her into his truck. As Lori got into the truck, Faulls told her he had a gun. Lori could see the gun in the backseat, and she testified that she was afraid to attempt escaping because she knew Faulls had a gun in the truck and feared he would hurt someone. The kidnapping was Faulls's third violent outburst toward Lori in the weeks leading up to the kidnapping, and the second involving a gun.

Though Faulls does not dispute that the gun played an important role in the kidnapping, he argues that he did not "use" the gun within the meaning of the relevant Sentencing Guideline. We disagree. Because Faulls employed the gun to convey an imminent threat, not merely the theoretical possibility of future harm, his conduct amounted to "use" of a gun under the applicable Guideline. We therefore affirm.

2

## I.      Background

Faulls's kidnapping offense was not the first time he committed intimate partner violence against Lori.[1] In June 2012, two months before the kidnapping, Lori moved out of the home that she and Faulls had long shared. A few weeks after Lori moved out, Faulls verbally berated her when she returned to the home to pick up some medical records. Just as Lori started to leave, Faulls came out of the garage carrying a gun and began walking toward her. Lori asked Faulls if he was going to kill her. In response, Faulls "flipped [the gun] up on to his shoulder and he just kind of started laughing." J.A. 108. Faulls then took Lori's cellphone from her and used it to call the friend she was staying with at the time. Faulls told Lori's friend: "you just killed your friend," referring to Lori. J.A. 110. When Lori attempted to drive away from the house, Faulls sped after her in his car and rear-ended her.

A few weeks later, Faulls physically attacked Lori at the apartment where she was staying temporarily with their daughter. Faulls showed up at the apartment and began behaving aggressively. When their daughter tried to call the police, Faulls grabbed the cellphone and punched Lori in the chest. Faulls told their daughter, "[you] just killed the best friend [you] ever had," again implicitly threatening Lori. J.A. 23.

---

[1] "Intimate partner violence" is abuse or aggression that occurs in a romantic relationship. The term includes all types of intimate relationships, including those between both current and former spouses and dating partners, and is not exclusive to people living together. *See generally About Intimate Partner Violence*, U.S. Centers for Disease Control and Prevention (Aug. 4, 2025, 5:12 PM), https://perma.cc/94Z3-ALJC; *Intimate Partner Violence*, Community Health Collection (Aug. 4, 2025, 5:12 PM) https://perma.cc/A7LV-CC3V.

Several days after the attack at the apartment, Faulls asked Lori to come pick him up to drive him to retrieve his truck from a repair shop. She agreed to help him. When Lori arrived at the house, Faulls took her cellphone and car keys from her and told her that they were going on a trip. He then pulled out zip ties that had been fashioned into handcuffs and asked Lori "if [she] wanted to do this the easy way or the hard way." J.A. 128. Lori responded that she wanted to do it the easy way, and the two walked toward Faulls's truck.

As they approached the truck, Lori noticed a gun in the back seat. Faulls told Lori that he had rigged the truck's door handle and window to make it impossible for her to open them from the inside. After forcing Lori into his truck, Faulls drove her to West Virginia where they checked into a motel. At the motel, Faulls raped Lori.

The following day, Faulls and Lori drove to a convenience store to purchase toiletries. While they were at the store, Lori contemplated attempting to escape or hide. She ultimately decided against it, however, because she "knew there was a gun in the car" and was afraid Faulls "would go out and get that gun and maybe bring it in and hurt other people." J.A. 134. Lori got back into the truck and Faulls continued to drive. Later, at a rest stop overlooking a cliff, Faulls told Lori that he could drive them off the cliff. He then got out of the truck to wrap his gun in a blanket and move it to the bed of his truck, where other drivers were less likely to notice it.

Later that night, Lori managed to escape. Faulls and Lori went to a bar where Lori encouraged Faulls to drink, in her words, "a lot more than he would ever normally drink." J.A. 140. When the two left the bar, it was raining heavily. Lori seized the opportunity and ran away from Faulls. She found two women who were getting into a car and asked them

4

to help her. The women agreed and drove Lori to a local sheriff's office. Inside the sheriff's office, Lori told the sheriff's deputies that Faulls had kidnapped her. The deputies went out to search for Faulls and ultimately located and arrested him. At the time of Faulls's arrest, the deputies found his gun in the bed of his truck.

Faulls was tried by a jury and convicted of three counts: kidnapping, in violation of 18 U.S.C. § 1201(a)(1) (Count 1); interstate domestic violence, in violation of 18 U.S.C. § 2261(a)(2) and (b)(4) (Count 2); and possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 3). The district court calculated a United States Sentencing Guidelines advisory range of 292 to 365 months' imprisonment for Counts 1 and 2, to be served concurrently, followed by a mandatory consecutive sentence of 60 months' imprisonment for Count 3.

The district court varied downward from this Guidelines range, in part because of Faulls's mental health issues, and sentenced him to a total of 235 months' imprisonment on Counts 1 and 2. With the addition of the mandatory 60-month sentence on Count 3, Faulls's sentence totaled 295 months. This court affirmed the district court's sentence on direct appeal. *United States v. Faulls*, 821 F.3d 502 (4th Cir. 2016).

Four years after his initial sentencing, Faulls filed a post-conviction motion under 28 U.S.C. § 2255 seeking to vacate his convictions on Counts 2 and 3. He argued that intervening decisions of the Supreme Court and this court rendered these counts inapplicable. The district court agreed.

The crimes charged in Counts 2 and 3 both require a predicate crime of violence. For Count 2 (interstate domestic violence), the predicate crime of violence was aggravated

5

sexual abuse. For Count 3 (possession of a firearm in furtherance of a crime of violence), the predicate crime of violence was kidnapping. To determine whether an offense is a crime of violence, this court "look[s] to whether the statutory elements of the offense necessarily *require* the use, attempted use, or threatened use of physical force." *United States v. Walker*, 934 F.3d 375, 378 (4th Cir. 2019) (emphasis added) (internal citation omitted). In conducting this analysis, "we use the categorical approach, looking only at the elements of the crime and not at the particular facts in the case." *Id.*

The district court recognized that several years after Faulls was convicted, this court, applying the Supreme Court's holding in *United States v. Davis*, 588 U.S. 445 (2019), held that kidnapping did not categorically qualify as a crime of violence. *See Walker*, 934 F.3d at 379. The district court further determined that aggravated sexual abuse was also not properly considered a "crime of violence" under the categorical approach. Thus, the district court vacated Faulls's convictions for Counts 2 and 3 and ordered a resentencing hearing on the sole remaining count, Count 1 (kidnapping).

On resentencing, the Government for the first time sought the imposition of a sentencing enhancement for use of a dangerous weapon, U.S.S.G. § 2A4.1(b)(3) ("the (b)(3) Enhancement"). Under the (b)(3) Enhancement, a kidnapping offense is subject to a base offense level increase of two steps "[i]f a dangerous weapon was used." U.S.S.G. § 2A4.1(b)(3). The (b)(3) Enhancement was not imposed at Faulls's original sentencing because it would have been duplicative of Count 3, possession of a firearm in furtherance of a crime of violence. At resentencing, Faulls argued that the (b)(3) Enhancement was inapplicable because he had not "used" a gun within the meaning of that enhancement. The

6

district court disagreed and, applying the (b)(3) Enhancement, imposed a 295-month sentence for Count 1, which was identical to Faulls's original sentence for all three counts.

## II.    Standard of Review

In evaluating a district court's application of a Sentencing Guideline, our standard of review "depends on whether a given dispute is mostly legal or factual." *United States v. Pettus*, 90 F.4th 282, 285 (4th Cir. 2024) (citation omitted). "If the issue on appeal turns primarily on a factual determination, we apply the 'clearly erroneous' standard." *Id.* (citation omitted). "In contrast, if the issue turns primarily on the legal interpretation of a [G]uideline term, the standard moves closer to *de novo* review." *Id.* (quoting *United States v. Steffen*, 741 F.3d 411, 414 (4th Cir. 2013)). The government bears the burden of proving by a preponderance of the evidence that the contested enhancement applies. *Steffen*, 741 F.3d at 414.

The parties dispute whether the district court's conclusion that Faulls "used" a firearm was a legal or factual determination. Our sister circuits differ on this issue. *Contrast United States v. De La Rosa*, 911 F.2d 985, 993 (5th Cir. 1990) (concluding that the "clearly erroneous" standard applied), *with United States v. Roberts*, 898 F.2d 1465, 1469 (10th Cir. 1990); *United States v. Bolden*, 479 F.3d 455, 460 (6th Cir. 2007) (determining that *de novo* review was appropriate because the inquiry primarily turned on a question of legal interpretation).

The Government argues that clear error review is the correct standard, relying on *United States v. Gross*, 90 F.4th 715 (4th Cir. 2024). In *Gross*, this court determined that

7

whether "serious bodily injury" occurred, as defined by U.S.S.G. § 2A2.2(b)(3)(B), is "essentially factual" and "thus is reviewed for clear error." 90 F.4th at 722. *Gross* is distinguishable, however, because the parties in that case disputed the *extent* of the victim's injuries, not just the meaning of the phrase "serious bodily injury." *See id.* at 723. The defendant in *Gross* argued that the victim's injuries should not have been classified as "serious" because 1) the victim initially denied that he was in pain, and 2) the hospital records referred to the injury as "superficial." *Id.* These were fact-specific arguments that the district court improperly weighed evidence, not that it misinterpreted the meaning of statutory terms.

Here, by contrast, there is no dispute over the facts or the sufficiency of evidence. Neither party disputes what Faulls did with the gun. Nor do the parties dispute the inferences the district court drew from the relevant facts.

This case is more analogous to *United States v. Dodd*, 770 F.3d 306 (4th Cir. 2014). There, this court determined that the question of whether private correctional officers occupied a "high-level decision-making or sensitive position," as defined by U.S.S.G. § 2C1.1(b)(3), was an issue of law reviewable *de novo*. *Dodd*, 770 F.3d at 309. Resolving that issue primarily required an analysis of text and precedent, not factual evidence. *Id.* at 310–12; *see also United States v. Ebersole*, 411 F.3d 517, 535–36 (4th Cir. 2005) (applying *de novo* review to the district court's determination regarding whether defendant occupied a "position of trust" under U.S.S.G. § 3B1.3).

Here, "the facts . . . are undisputed, [thus] the only question before us is one of Guidelines application, a question on which our standard of review approaches *de novo*."

8

*United States v. Fullilove*, 388 F.3d 104, 106 (4th Cir. 2004) (italics added) (citation omitted). Evaluating whether Faulls "used" a firearm within the meaning of the (b)(3) Enhancement is primarily a legal determination that turns on analyzing statutory text and precedent, not on analyzing uncontested facts.

## III.      Analysis

We now turn to applicability of the (b)(3) Enhancement. For a federal kidnapping, abduction, or unlawful restraint offense such as Count 1 (the kidnapping offense), the (b)(3) Enhancement increases a defendant's base offense level by two steps "[i]f a dangerous weapon was used." U.S.S.G. § 2A4.1(b)(3). The commentary to the Guidelines states that the phrase "'[a] dangerous weapon was used' means that a firearm was discharged, or a 'firearm' or 'dangerous weapon' was 'otherwise used' [ ] as defined in the commentary to § 1B1.1." *Id.* § 2A4.1 cmt. n.2.[2]

The commentary to Sentencing Guideline Section 1B1.1 provides that "'[o]therwise used' with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was *more than brandishing*, displaying, or possessing a firearm or other dangerous weapon." U.S.S.G. § 1B1.1 cmt. n.1(J) (emphasis added). "Brandished" is defined as follows:

> "Brandished" with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate

---

[2] We defer to the Guidelines commentary only where a Guideline is ambiguous, which it is here. *See United States v. Mitchell*, 120 F.4th 1233, 1239 (4th Cir. 2024).

that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.

*Id.* § 1B1.1 cmt. n.1(C).

To summarize, the commentary to the Guidelines establishes that one does not "use" a firearm to commit a federal kidnapping offense unless he does *more than brandish* that firearm, and "brandishing" means displaying the gun (or making its presence known) in order to intimidate the victim. Under this commentary, then, the enhancement for "otherwise us[ing]" a gun applies to conduct that goes beyond brandishing a gun but falls short of discharging it.

In analyzing the (B)(3) Guideline, our sister circuits have converged on the conclusion that a gun is "otherwise used" when it is employed to "create[ ] a personalized *threat* of harm" rather than to generally intimidate. *United States v. Kruger*, 839 F.3d 572, 578 (7th Cir. 2016) (citation omitted) (emphasis added); *see United States v. Cover*, 199 F.3d 1270, 1278 (11th Cir. 2000) (explaining that "[like] the majority of courts that have considered the question, [we] find that the use of a firearm to make an explicit or implicit threat against a specific person constitutes 'otherwise use' of the firearm."); *United States v. Dunigan*, 555 F.3d 501, 505 (5th Cir. 2009) (concluding that the enhancement applies where the threat to the victim is "specific rather than general"); *see also United States v. Orr*, 312 F.3d 141, 144–45 (3d Cir. 2002); *United States v. LaFortune*, 192 F.3d 157, 161–62 (1st Cir. 1999); *United States v. De La Rosa*, 911 F.2d 985, 993 (5th Cir. 1990).

In delineating the boundary between "intimidation" and "threat," the Sixth Circuit considers whether the gun was employed to a) imply the possibility of *future* harm at some

10

unspecified time; or b) communicate a threat of *immediate* harm. *Bolden*, 479 F.3d at 461. In the Sixth Circuit's view, only the latter crosses the line from "brandishing" a gun to "otherwise using" it. *Id.* We agree with this approach. By the plain terms of the Guidelines commentary, the (B)(3) Enhancement encompasses conduct with a gun that goes beyond intimidation yet falls short of discharge. Though the text of the commentary does not define the precise contours of this realm of conduct, we are persuaded that the Sixth Circuit's formulation captures the intent of the Sentencing Commission. There is a meaningful difference between intimidation—which implies the mere possibility of future harm—and an imminent threat. Faulls contends that the relevant question is whether the gun was *pointed* at the victim, not whether there was an imminent threat. According to Faulls, the (b)(3) Enhancement applies only when a defendant undertakes some physical action with the gun, such as pointing it or using it as a bludgeon. Faulls points to several cases in which courts applied the (b)(3) Enhancement where the defendant physically pointed the gun at a victim. In relying on these cases, however, Faulls mistakes a sufficient condition for a necessary one. Though pointing a gun at a person will necessarily convey an imminent threat and thus constitute more than brandishing, no court has held that the (b)(3) Enhancement is inapplicable *unless* the defendant points a gun.

Faulls employed his gun to threaten his estranged wife Lori with imminent harm, not to convey a hypothetical possibility of harm in the future. Faulls knew Lori would feel threatened by the gun and that it would make her afraid to attempt escape. When Faulls kidnapped Lori, he let her know about the gun as soon as she got into his truck, immediately after he showed her the zip ties that were fashioned into handcuffs and asked whether she

11

wanted to "do this the easy way or the hard way." J.A. 128. This was an implicit threat of imminent harm. At no point during the kidnapping was the possibility of physical violence against Lori merely theoretical. In the weeks leading up to the kidnapping, Faulls rear-ended her car and punched her in the chest. Shortly after Faulls kidnapped Lori, he raped her. And moments before Faulls picked up his gun to move it from the backseat to the truck bed, he told Lori that he could drive them off a cliff. The combined force of these episodes created an imminent threat of violence with the gun. Faulls's conduct went beyond non-specified intimidation.

Unsurprisingly, the gun had its intended effect in furthering the kidnapping. Lori testified that she considered trying to escape when they stopped at the convenience store. She decided against it, however, when she remembered the gun. To conclude under these circumstances that Faulls did not "use" a gun in kidnapping Lori would strain common sense.

## IV.    Conclusion

Because he employed a gun to convey an imminent threat, Faulls "used" a dangerous weapon in furtherance of the crime of kidnapping. Accordingly, we affirm the district court's application of the (b)(3) Enhancement.

*AFFIRMED*

12